PER CURIAM.
The Attorney General has petitioned this Court for an advisory opinion concerning the validity of a proposed citizen initiative amendment to the Florida Constitution. The proponent of the initiative is a group known as Smoke-Free for Health, Incorporated (Smoke-Free). We have jurisdiction. See art. IV, § 10; art. V, § 3(b)(10), Fla. Const. This Court issued an order permitting interested parties to file briefs with regard to the proposed amendment.[1]
The ballot title and summary for the proposed amendment are as follows:
Ballot title: Protect People from the Health Hazards of Second Hand Tobacco Smoke by Prohibiting Workplace Smoking.
Ballot summary: To protect people from the health hazards of second-hand tobacco smoke, this amendment prohibits tobacco smoking in enclosed indoor workplaces. Allows exceptions for private residences except when they are being used to provide commercial child care, adult care or health care. Also allows exceptions for retail tobacco shops, designated smoking guest rooms at hotels, and other public lodging establishments, and standalone bars. Provides definitions, and requires the legislature to promptly implement this amendment.
The text of the proposed amendment, which would add section 20 to article X of the Florida Constitution, states:
BE IT ENACTED BY THE PEOPLE OF FLORIDA THAT:
WHEREAS, second-hand tobacco smoke is a known human carcinogen (contains cancer-causing agents) for which there is no safe level of exposure, and causes death and disease; WHEREAS, exposure to second-hand tobacco smoke frequently occurs in the workplace; and WHEREAS, ventilation and filtration systems do not remove the cancer-causing substances from secondhand smoke; NOW, THEREFORE, to protect people from the health hazards of second-hand tobacco smoke, the citizens of Florida hereby amend Article X of the Florida Constitution to add the following as section 20:
SECTION 20. Workplaces Without Tobacco Smoke.—
(a) Prohibition. As a Florida health initiative to protect people from the health hazards of second-hand tobacco smoke, tobacco smoking is prohibited in enclosed indoor workplaces.
(b) Exceptions. As farther explained in the definitions below, tobacco smoking may be permitted in private residences *417 whenever they are not being used commercially to provide child care, adult care, or health care, or any combination thereof; and further may be permitted in retail tobacco shops, designated smoking guest rooms at hotels and other public lodging establishments; and stand-alone bars. However, nothing in this section or in its implementing legislation or regulations shall prohibit the owner, lessee, or other person in control of the use of an enclosed indoor workplace from further prohibiting or limiting smoking therein.
(c) Definitions. For purposes of this section, the following words and terms shall have the stated meanings:
“Smoking” means inhaling, exhaling, burning, carrying, or possessing any lighted tobacco product, including cigarettes, cigars, pipe tobacco, and any other lighted tobacco product.
“Second-hand smoke,” also known as environmental tobacco smoke (ETS), means smoke emitted from lighted, smoldering, or burning tobacco when the smoker is not inhaling; smoke emitted at the mouthpiece during puff drawing; and smoke exhaled by the smoker.
“Work” means any person’s providing any employment or employment-type service for or at the request of another individual or individuals or any public or private entity, whether for compensation or not, whether full or part-time, whether legally or not.
‘Work” includes, without limitation, any such service performed by an employee, independent contractor, agent, partner, proprietor, manager, officer, director, apprentice, trainee, associate, servant, volunteer, and the like.
“Enclosed indoor workplace” means any place where one or more persons engages in work, and which place is predominantly or totally bounded on all sides and above by physical barriers, regardless of whether such barriers consist of or include uncovered openings, screened or otherwise partially covered openings, or open or closed windows, jalousies, doors, or the like. This section applies to all such enclosed indoor workplaces without regard to whether work is occurring at any given time. “Commercial” use of a private residence means any time during which the owner, lessee, or other person occupying or controlling the use of the private residence is furnishing in the private residence, or causing or allowing to be furnished in the private residence, child care, adult care, or health care, or any combination thereof, and receiving or expecting to receive compensation therefor.
“Retail tobacco shop” means any enclosed indoor workplace dedicated to or .predominantly for the retail sale of tobacco, tobacco products, and accessories for such products, in which the sale of other products or services is merely incidental.
“Designated smoking guest rooms at public lodging establishments” means the sleeping rooms and directly associated private areas, such as bathrooms, living rooms, and kitchen areas, if any, rented to guests for their exclusive transient occupancy in public lodging establishments including hotels, motels, resort condominiums, transient apartments, transient lodging establishments, rooming houses, boarding houses, resort dwellings, bed and breakfast inns, and the like; and designated by the person or persons having management authority over such public lodging establishment as rooms in which smoking may be permitted.
“Stand-alone” bar means any place of business devoted during any time of operation predominantly or totally to serv *418 ing alcoholic beverages, intoxicating beverages, or intoxicating liquors, or any combination thereof, for consumption on the licensed premises; in which the serving of food, if any, is merely incidental to the consumption of any such beverage; and that is not located within, and does not share any common entryway or common indoor area with, any other enclosed indoor workplace including any business for which the sale of food or any other product or service is more than an incidental source of gross revenue.
(d) Legislation. In the next regular legislative session occurring after voter approval of this amendment, the Florida Legislature shall adopt legislation to implement this amendment in a manner consistent with its broad purpose and stated terms, and having an effective date no later than July 1 of the year following voter approval. Such legislation shall include, without limitation, civil penalties for violations of this section; provisions for administrative enforcement; and the requirement and authorization of agency rules for implementation and enforcement. Nothing herein shall preclude the Legislature from enacting any law constituting or allowing a more restrictive regulation of tobacco smoking than is provided in this section.
Our inquiry, in determining the validity of an initiative petition, is limited to two issues: whether the ballot title and summary is printed in clear and unambiguous language pursuant to section 101.161(1), Florida Statutes (2001), and whether the petition satisfies the single subject requirement of article XI, section 3, Florida Constitution. This Court does not review the merits of a proposed amendment. See Advisory Opinion to the Atty. Gen. re Right of Citizens to Choose Health Care Providers, 705 So.2d 563, 565 (Fla.1998); Advisory Opinion to the Atty. Gen. re People’s Property Rights Amendments Providing Compensation for Restricting Real Property Use May Cover Multiple Subjects, 699 So.2d 1304, 1306 (Fla.1997); see also Advisory Opinion to the Atty. Gen. re Tax Limitation, 644 So.2d 486, 489 (Fla.1994) (“This Court does not have the authority or the responsibility to rule on the merits or the wisdom of ... proposed initiative amendments.... ”).

BALLOT TITLE AND SUMMARY

Section 101.161(1), Florida Statutes (2001), states in pertinent part:
Whenever a constitutional amendment or other public measure is submitted to the vote of the people, the substance of such amendment ... shall be printed in clear and unambiguous language on the ballot .... [T]he substance of the amendment ... shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure. The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of.
Thus, the ballot title and summary must clearly and unambiguously state “the chief purpose of the measure,” Askew v. Firestone, 421 So.2d 151, 154 (Fla.1982), and must not be misleading. Advisory Opinion to the Atty. Gen. re Term Limits Pledge, 718 So.2d 798, 803 (Fla.1998). Moreover, the ballot title and summary must give “fair notice of the content of the proposed amendment to enable the casting of an intelligent and informed vote.” Advisory Opinion to the Atty. Gen.—Limited Casinos, 644 So.2d 71, 74 (Fla.1994).
We first consider Restaurant Association’s assertions with regard to the ballot title and summary. Restaurant Association contends that the title and summary are misleading because the definition of *419 “enclosed indoor workplace” does not indicate that smoking would be banned in places like restaurants, which many patrons visit for the sole purpose of relaxing. The summary for the instant proposal clearly states the purpose of the amendment is to prohibit tobacco smoking in enclosed indoor workplaces. The title also states “Prohibiting Workplace Smoking.” The summary indicates that definitions are provided in the amendment text, thereby alerting voters to review the contents of the amendment text. It is obvious that “[t]he seventy-five word limit placed on the ballot summary as required by statute does not lend itself to an explanation of all of a proposed amendment’s details.” Advisory Opinion to the Atty. Gen. re—Amendment to Bar Government from Treating People Differently Based on Race in Public Education, 778 So.2d 888, 899 (Fla.2000). It is not necessary that the title and summary explain every ramification of the proposed amendment. Carroll v. Firestone, 497 So.2d 1204, 1206 (Fla.1986). We conclude that as to Restaurant Association’s contention, the summary clearly states the chief purpose of the measure and gives “fair notice of the content of the proposed amendment to enable the casting of an intelligent and informed vote.” Limited Casinos, 644 So.2d at 74.[2] In our view, the argument that Florida citizens cannot understand that a restaurant may be a workplace is contrary to rational analysis.
Restaurant Association also asserts that the summary is misleading because it fails to disclose a major change in the law. Specifically, it argues that the summary fails to disclose the effect that the proposed amendment would have on sections 386.203, .205, Florida Statutes (2001). In general, those sections relate to existing smoking restrictions under certain circumstances in public places. Restaurant Association also contends that the summary is misleading because it does not disclose that smoking would be banned in workplaces that are not generally considered to be public places, and therefore fails to disclose its effect on certain parts of chapter 386, Florida Statutes (2001). We reiterate our conclusion that the summary adequately states its chief purpose of banning smoking in enclosed indoor workplaces and clarity does not require further references or definitions for validity here. As suggested by the proponents of the amendment, it does not stretch logic to presume that most, if not all, voters are aware that smoking is presently limited in certain public places, given the pervasiveness of signs and other remonstrations against smoking in those areas, and that people work in places such as restaurants. We agree. “The voter must be presumed to have a certain amount of common sense and knowledge.” Advisory Opinion to the Atty. Gen.—Tax Limitation, 673 So.2d 864, 868 (Fla.1996). Moreover, contrary to all arguments otherwise, “an exhaustive explanation of the interpretation and future possible effects of the amendment [is] not required” in the ballot title and summary. Race in Public Education, 778 So.2d at 899. We are most concerned with relationships and impact on other areas of law when we consider whether the ballot summary and title mislead the voter with regard to effects and impact on other constitutional provisions. See Race in Public Education, 778 So.2d at 899-900 (stating that ballot, summaries must be invalidated when they fail to mention constitutional provisions that are affected, or when they *420 fail to define terms adequately or to use consistent terminology). We conclude that the instant proposal does not mislead in this area.[3]
We next consider Tobacco’s arguments that the ballot title and summary are defective because each contains terms that constitute impermissible political or inflammatory rhetoric. Specifically, Tobacco focuses on the use of the words “protect” and “hazards” in the ballot title and summary, and contends that the appearance of these terms on the ballot would constitute judicial adjudication of unproven facts. On these points, we disagree.[4]
On this issue Tobacco asserts that the instant proposal is similar to the initiative we found invalid in In re Advisory Opinion to the Atty. Gen.-Save Our Everglades, 636 So.2d 1386, 1341-42 (Fla.1994). There, we determined that the ballot title was deficient because, in considering the term “save,” a voter. could easily be led into believing that the Everglades ecosystem was lost.. The text of the amendment itself gave no indication of the severity of pollution and other perils purportedly threatening the Everglades, and employed the term “restore” rather than the word “save,” which appeared in the title. We also noted that the ballot summary implied that the sugarcane industry would only be required to assist in an Everglades cleanup, while the amendment text provided no indication that any other entity would assist the sugarcane industry with the cleanup. There we determined that the title caused the proposal to “fly under false colors.” We concluded that the ballot summary was political rhetoric with an emotional appeal, rather than “an accurate and informative synopsis of the meaning and effect of the proposed amendment.” Id. at 1342. The summary in Save Our Everglades was determined to be a subjective evaluation of the impact of the proposed amendment as opposed to a summary of the legal effect which is accomplished by the summary presented here.
In our view, the singular use of the word “hazards” in the ballot title and summary of the instant proposal does not rise to a comparable level of political and emotional language and subjective evaluation as the language we rejected in Save Our Everglades. Since no definition of “hazard” is provided in the text of the proposed amendment, we resort to the dictionary definition.[5] In doing so, we note that the meaning associated with the term is that of *421 “chance” or “risk.”[6] When considered in this light, the language in the ballot summary consisting of the use of one word refers to a chance or risk that Florida citizens can evaluate in connection with the proposed limitations contained within the proposed amendment. Neither we nor the voters decide the fact of harm but evaluate the proposal with reference to risks or chances. Moreover, the instant proposal does not involve, as did the rejected language in Save Our Everglades, the legerdemain of employing an emotional term (“save”) in the ballot title or summary while substituting a more docile term (“restore”) in the amendment text. Authorization of the instant measure’s appearance on the ballot simply does not constitute adjudication or acceptance of statements contained therein as a factual determination. Our review is confined to the aspects of clarity and lack of ambiguity -within the ballot title and summary. With regard to the instant proposal, the voters will ultimately determine the -wisdom of the policy alternative presented to them. If there is no risk or chance of harm from such conditions the voters’ voice will certainly be heard. We conclude that the use of the term “hazards” does not mislead voters and is clearly related to the choice placed before them.
In a similar manner, use of the term “protect” does not constitute impermissible political rhetoric or the adjudication of a fact. Tobacco asserts that this term has political or emotional underpinnings, and that whether the instant proposal would “protect” voters from the possible harm of second-hand smoke is not a fact which this Court should adjudicate. Yet, in its brief Tobacco alludes to the amendment proposals in Advisory Opinion to the Atty. Gen.—Fee on the Everglades Sugar Production, 681 So.2d 1124 (Fla.1996), as exemplars of “neutral” language in a citizen initiative. In two of the three amendment proposals we reviewed in Fee on Everglades, the ballot summary stated that the purpose of the amendment was for “conservation and protection of natural resources and abatement of water pollution in the Everglades.” On one hand, Tobacco implies that the use of the term “protection” in Fee on Everglades is neutral and does not constitute adjudication of a fact. On the other, however, Tobacco asserts that the use of the term “protect” in the instant proposal is infected with political or emotional sentiment. Moreover, Tobacco posits that the employment of the term in the instant proposal impermissibly determines, as a factual matter, that voters would be sheltered from the risk of harm from second-hand smoke.
We are unable to discern the logic as to how the application of essentially the same term can produce such dramatically different results. We concluded in Fee on Everglades that the ballot titles and summaries were not misleading. Our opinion did not in any way indicate that the appearance of the proposed amendment on the ballot constituted our adjudication or acceptance, as fact, that the proposals would actually be effective in protecting or conserving the Everglades. Nor does our authorization for this proposed amendment to appear on the ballot constitute an adjudication of whether second-hand smoke is hazardous or whether the proposal will be effective in protecting citizens from any actual or perceived harm attendant to second-hand smoke. As mentioned above, those considerations are reserved for the voters. The ballot summary and title in the instant proposal are not misleading, nor are they “clearly and conclusively defective.” As *422 kew v. Firestone, 421 So.2d 151, 154 (Fla.1982) (noting that language in citizen initiative must be clearly and conclusively defective to justify removal of measure from the ballot). Therefore, we decline to strike the measure from the ballot based on our review of the title and summary.[7]

SINGLE-SUBJECT REQUIREMENT

Article XI, section 3 of the Florida Constitution requires that proposed citizen-initiative amendments “embrace but one subject and matter directly connected therewith.” “[Sjection 3 protects against multiple ‘precipitous’ and ‘cataclysmic’ changes in the constitution by limiting to a single subject what may be included in any one amendment proposal.” Advisory Opinion to the Atty. Gen. re Fish & Wildlife Conservation Comm’n, 705 So.2d 1351, 1353 (Fla.1998). To satisfy the single-subject requirement, a proposed amendment must express a “logical and natural oneness of purpose.” Fine v. Firestone, 448 So.2d 984, 990 (Fla.1984). “[I]t is when a proposal substantially alters or performs the functions of multiple branches of government that it violates the single-subject test.” Fish & Wildlife Conservation Comm’n, 705 So.2d at 1354. Moreover, the mere possibility that an amendment might interact with other parts of the Florida Constitution is not sufficient reason to invalidate the proposed amendment. See Fee on Everglades, 681 So.2d at 1128.
Restaurant Association challenges the instant proposal on several single-subject grounds. None requires significant discussion, however, as we determine that the instant proposal focuses on a single subject: the issue of second-hand smoke in enclosed indoor workplaces. The measure respects the legislative function by making allowance for the Legislature to enact statutes to implement the constitutional provision. The proposal does not perform any judicial functions by-adjudicating specific facts.[8] We also reject Restaurant Association’s other single-subject contentions as lacking in merit.
The ballot title in the instant proposal does not exceed fifteen words, and the ballot summary does not exceed seventy-five words, thereby falling within statutory requirements. The title and summary also meet the other legal requirements of article XI, section 3 of the Florida Constitution, and section 101.161(1), Florida Statutes (2001). Accordingly, we determine that they provide the citizens of Florida with the necessary information to cast an intelligent and informed vote. This opinion encompasses no other issues, and should not be construed as favoring or opposing the passage of the proposed amendment.
It is so ordered.
*423 WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.

. Briefs in support of the proposed amendment were submitted jointly in the name of the American College of Physicians and several other groups (ACP). Briefs in opposition to the proposal were submitted jointly by Loril-lard Tobacco and several other groups (Tobacco), as well as by the Florida Restaurant Association (Restaurant Association). Smoke-Free for Health, Inc. (Smoke-Free), the proponent of the measure, filed an initial brief and a reply brief.

. We further reject as meritless Restaurant Association’s other claims that the instant proposal employs vague terms.

.Restaurant Association’s reliance on our opinion in Advisory Opinion to the Atty. Gen. re Casino Authorization, Taxation & Regulation, 656 So.2d 466, 469 (Fla.1995), is unavailing. There, we determined that a ballot summary was defective because it would mislead voters into believing that to ban casinos in Florida they must cast an affirmative vote for the amendment. The summary failed to disclose that Florida law already banned casinos. The scenario is not the same in the instant case, because the ballot summary does not attempt to deceive the voter into believing or having any particular impression with regard to the present status of smoking in Florida. We also note that in the other cases on which Restaurant Association relies for support on this point, the ballot summary was misleading because it failed to disclose the proposed measure’s impact on existing constitutional, not statutory, provisions.

. Restaurant Association presents similar arguments on these points in its opposition brief.

. In determining the meaning of a term in a citizen initiative, we have previously resorted to a dictionary definition when no definition was provided in the amendment text. See Advisory Opinion to the Governor—1996 Amendment 5 (Everglades), 706 So.2d 278, 282 (Fla.1997) (providing advisory opinion on meaning of term "primarily responsible” with regard to initiative on Everglades preservation).

. Merriam-Webster's Collegiate Dictionary at 534 (10th ed.1996). Moreover, "hazardous” ís defined as "involving or exposing one to risk (as of loss or harm).” Id.

. In his petition seeking review of the instant proposal, the Attorney General presented a concern with regard to the language that describes when smoking is permitted in private residences which provide commercial care to children, adults, or health patients. Smoke Free asserted both in its brief and at oral argument that the language unambiguously indicates that smoking would be permitted at times during which a private residence is not being used to provide commercial care. We agree. The proposal is not misleading on this point. ,

. We agree with the Attorney General that • language contained in the "whereas” clauses of the proposed initiative "[does] not appear to be a part of the actual proposed amendment to add section 20 to Article X, Florida Constitution.” See Letter from Attorney General Robert Butterworth to Chief Justice Charles T. Wells and Justices of Supreme Court of Florida at 7 (November 7, 2001) (on file with Supreme Court of Florida). Perfor-manee of a judicial function is therefore not an issue with regard to the "whereas” language.