880 So.2d 667 (2004)
ADVISORY OPINION TO THE ATTORNEY GENERAL RE PUBLIC PROTECTION FROM REPEATED MEDICAL MALPRACTICE.
No. SC04-778.
Supreme Court of Florida.
July 15, 2004.
Charles J. Crist, Jr., Attorney General and Louis F. Hubener, Chief Deputy Solicitor General, Tallahassee, FL, for Petitioner.
Scott Henry Carruthers, Chair, Tallahassee, FL; and Jon Mills and Timothy *668 McLendon, Gainesville, FL, for Floridians for Patient Protection, Proponents.
Stephen H. Grimes and Susan L. Kelsey of Holland and Knight, LLP, Tallahassee, FL, on behalf of Florida Medical Association, Inc.; and Harold R. Mardenborough, Jr. of McFarlain and Cassedy, P.A., Tallahassee, FL, and Graham H. Nichol, General Counsel, and Don A. Dennis, Associate General Counsel, Tallahassee, FL, on behalf of Florida Dental Association, for Opponents.
PER CURIAM.
The Attorney General has requested this Court to review a proposed amendment to the Florida Constitution that would bar any person found to have committed three or more incidents of medical malpractice from being licensed to provide health care services as a medical doctor. We have jurisdiction. See art. IV, § 10; art V, § 3(b)(10), Fla. Const.

I. THE PROPOSED AMENDMENT AND BALLOT SUMMARY
The full text of the proposed amendment states:
a) Statement and Purpose:
Under current law, a medical doctor who has repeatedly committed medical malpractice in Florida or while practicing in other states or counties may obtain or continue to hold a professional license to practice medicine in Florida. The purpose of this amendment is to prohibit such a doctor from obtaining or holding a license to practice medicine in Florida.
b) Amendment of Florida Constitution:
Art. X, Fla. Const., is amended by inserting the following new section at the end thereof, to read:
"Section 20. Prohibition of Medical License After Repeated Medical Malpractice.
"a) No person who has been found to have committed three or more incidents of medical malpractice shall be licensed or continue to be licensed by the State of Florida to provide health care services as a medical doctor.
"b) For purposes of this section, the following terms have the following meanings:
"i) The phrase `medical malpractice' means both the failure to practice medicine in Florida with that level of care, skill, and treatment recognized in general law related to health care providers' licensure, and any similar wrongful act, neglect, or default in other states or countries which, if committed in Florida, would have been considered medical malpractice.
"ii) The phrase `found to have been committed' means that the malpractice has been found in a final judgment of a court of law, final administrative agency decision, or decision of binding arbitration."
c) Effective Date and Severability:
This amendment shall be effective on the date it is approved by the electorate. If any portion of this measure is held invalid for any reason, the remaining portion of this measure, to the fullest extent possible, shall be severed from the void portion and given the fullest possible force and application.
The ballot title for the proposed amendment is "Public Protection from Repeated Medical Malpractice." And the ballot summary for the proposed amendment states:
Current law allows medical doctors who have committed repeated malpractice to be licensed to practice medicine in Florida. *669 This amendment prohibits medical doctors who have been found to have committed three or more incidents of medical malpractice from being licensed to practice medicine in Florida.

II. STANDARD AND SCOPE OF REVIEW
Review of the validity of an amendment to the Florida Constitution proposed by initiative is limited to two issues: (1) whether the proposed amendment satisfies the single-subject limitation of article XI, section 3 of the Florida Constitution; and (2) whether the ballot title and summary satisfy the requirements of section 101.161(1), Florida Statutes (2003). Advisory Op. to Att'y Gen. re Fish & Wildlife Conservation Comm'n, 705 So.2d 1351, 1353 (Fla.1998). This Court does not review the merits or the wisdom of the proposed amendment. Advisory Op. to Att'y Gen. re Right of Citizens to Choose Health Care Providers, 705 So.2d 563, 565 (Fla.1998); see also Smith v. Coalition to Reduce Class Size, 827 So.2d 959, 963 (Fla.2002) (if initiative meets requirements of article XI, section 3, Florida Constitution, "then the sponsor of an initiative has the right to place the initiative on the ballot").

III. SINGLE-SUBJECT REQUIREMENT
Article XI, section 3 of the Florida Constitution requires that an amendment proposed by initiative "shall embrace but one subject and matter directly connected therewith." To comply with this single-subject requirement, a proposed amendment must manifest a "logical and natural oneness of purpose." Fine v. Firestone, 448 So.2d 984, 990 (Fla.1984). There are two primary purposes for imposing the single-subject requirement. The first is to prevent "logrolling," which is a "practice whereby an amendment is proposed which contains unrelated provisions, some of which electors might wish to support, in order to get an otherwise disfavored provision passed." See Advisory Op. to Att'y Gen. re Limited Casinos, 644 So.2d 71, 73 (Fla.1994) (citing Advisory Op. to Att'y Gen.Limited Marine Net Fishing, 620 So.2d 997 (Fla.1993)). The second purpose is to prevent a single constitutional amendment from substantially altering or performing the functions of multiple aspects of government. See In re Advisory Op. to Att'y Gen.Save Our Everglades, 636 So.2d 1336, 1340 (Fla.1994).
The opponents of the instant proposed amendment, the Florida Medical Association and the Florida Dental Association, do not argue that the proposed amendment presents any danger of logrolling, and we find that the proposed amendment contains only related provisions aimed at achieving a single goal. However, the opponents do argue that the proposed amendment violates the single-subject requirement because it substantially alters or performs the functions of multiple aspects of government.
As we previously have stated, "[a]lthough a proposal may affect several branches of government and still pass muster, no single proposal can substantially alter or perform the functions of multiple branches." Save Our Everglades, 636 So.2d at 1340.
We recognize that all power for each branch of government comes from the people and that the citizens of the state have retained the right to broaden or to restrict that power by initiative amendment. But where such an initiative performs the functions of different branches of government, it clearly fails the functional test for the single-subject limitation the people have incorporated into article XI, section 3, Florida Constitution.
*670 Evans v. Firestone, 457 So.2d 1351, 1354 (Fla.1984).
In the present case, the proposed amendment, if adopted, clearly would supercede section 458.331(1)(t), Florida Statutes (2003),[1] and revoke any discretion the Board of Medicine previously had with regard to the discipline of any medical doctor found to have committed three or more incidents of medical malpractice. It would also limit the Legislature's power to enact any other law in conflict with the proposed amendment. However, we conclude that these effects on the legislative and executive branches are not sufficiently substantial to constitute the type of "multiple `precipitous' and `cataclysmic' changes"[2] that the single-subject requirement is designed to prevent. We also find that this proposed amendment is clearly distinguishable from prior proposed amendments stricken by this Court because of the breadth of their effects. See Advisory Op. to Att'y Gen. re Requirement for Adequate Pub. Educ. Funding, 703 So.2d 446 (Fla.1997) (concluding proposed amendment allocating minimum forty percent of state appropriations to education would substantially affect all other functions of government by limiting appropriations available to those functions); Advisory Op. to Att'y Gen. re People's Prop. Rights Amendments Providing Comp. for Restricting Real Prop. Use May Cover Multiple Subjects, 699 So.2d 1304 (Fla.1997) (concluding proposed amendment requiring full compensation when government restricts use of private real estate in certain circumstances would substantially affect Legislature's power to enact legislation establishing standards and criteria for land use regulation, Legislature's constitutional duty to protect natural resources and scenic beauty, multiple functions of the executive branch, and more than one level of government); Advisory Op. to Att'y Gen. re Tax Limitation, 644 So.2d 486 (Fla.1994) (concluding proposed amendment requiring full compensation for any exercise of police power damaging value of vested private property right would substantially alter functions of multiple branches of government).
Additionally, we conclude that the proposed amendment does not substantially alter or perform the functions of the judiciary. First, it "does not perform any judicial functions by adjudicating specific facts." Advisory Op. to Att'y Gen. re Protect People from the Health Hazards of Second-Hand Smoke, 814 So.2d 415, 422 (Fla.2002). Second, it is too speculative to conclude, because the proposed amendment requires the revocation of some medical doctors' licenses on the basis of findings reached under the preponderance of the evidence standard, rather than the clear and convincing standard of proof required under Ferris v. Turlington, 510 So.2d 292 (Fla.1987), that the judiciary will be forced to either overrule Ferris or change the standard of proof in malpractice cases. Cf. Limited Casinos, 644 So.2d at 74 (finding scenarios raised by opponents *671 relating to possible impacts on other branches of government or on the Constitution were premature speculation); In re Advisory Op. to Att'y Gen.EnglishThe Official Language of Florida, 520 So.2d 11, 13 (Fla.1988) ("[I]t would be premature to speculate how the amendment might interact with other portions of the constitution as applied to a given factual situation. It may be that, if passed, the amendment could have broad ramifications. Yet, on its face it deals with only one subject."). As for the related argument that the proposed amendment will substantially affect the due process provision of the Florida Constitution, this Court has repeatedly stated that "the possibility that an amendment might interact with other parts of the Florida Constitution is not sufficient reason to invalidate the proposed amendment." Limited Casinos, 644 So.2d at 74.

IV. BALLOT TITLE AND SUMMARY
Section 101.161(1), Florida Statutes, requires that the ballot title not exceed fifteen words, that the ballot summary not exceed seventy-five words, and that the two "state in clear and unambiguous language the chief purpose of the measure." See Askew v. Firestone, 421 So.2d 151, 154-55 (Fla.1982). "This requirement provides the voters with fair notice of the contents of the proposed initiative so that the voter will not be misled as to its purpose and can cast an intelligent and informed ballot." Advisory Op. to Att'y Gen. re People's Property Rights Amendments, 699 So.2d at 1307; see also Askew, 421 So.2d at 155 ("Simply put, the ballot must give the voter fair notice of the decision he must make."). The ballot title and summary, however, "need not explain every detail or ramification of the proposed amendment." Advisory Op. to Att'y Gen. re Prohibiting Pub. Funding of Political Candidates' Campaigns, 693 So.2d 972, 975 (Fla.1997). "Our responsibility is to determine whether the language of the title and summary, as written, misleads the public." Right of Citizens To Choose Health Care Providers, 705 So.2d at 566.
The opponents to this proposed amendment attack the ballot title and summary on numerous grounds, the first of which relates to the use of the words "Public Protection" in the ballot title. The opponents argue that those words are misleading because they give a false impression that the public needs to be protected and constitute mere rhetoric rather than a disclosure of the chief purpose of the proposed amendment. For support, they cite this Court's decision in Save Our Everglades. In response, the proponents of the proposed amendment, Floridians for Patient Protection, argue that the proposed amendment, like all laws regarding physician licensing, is designed to protect the public and that use of the term "protect" does not constitute impermissible political rhetoric. For support, they cite this Court's decision in Protect People from the Health Hazards of Second-Hand Smoke.
In Save Our Everglades, this Court held:
The title of the present initiative "SAVE OUR EVERGLADES"is misleading. It implies that the Everglades is lost, or in danger of being lost, to the citizens of our State, and needs to be "saved" via the proposed amendment. Yet, nothing in the text of the proposed amendment hints at this peril. Section (a) avers only that the Everglades was polluted at some point in the past by the sugarcane industry. The severity of pollution is unmentionedit could be extensive, or relatively minor. Further, the text of the amendment clearly states that the purpose of the amendment is to "restore" the Everglades to its original condition, not to "save" it from peril. A *672 voter responding to the emotional language of the title could well be misled as to the contents and purpose of the proposed amendment. "A proposed amendment cannot fly under false colors; this one does." Askew v. Firestone, 421 So.2d at 156.
636 So.2d at 1341. However, in Protect People from the Health Hazards of Second-Hand Smoke, we held that use of the term "protect" in the title did not constitute impermissible political rhetoric or the adjudication of a fact, stating that "our authorization for this proposed amendment to appear on the ballot [does not] constitute an adjudication of ... whether the proposal will be effective in protecting citizens from any actual or perceived harm attendant to second-hand smoke." 814 So.2d at 421.
With regard to the instant ballot title, we conclude that it is not misleading nor does it "fly under false colors." First, similar to the term "protect" in Protect People from the Health Hazards of Second-Hand Smoke, the term "protection" in the instant case does not constitute impermissible political rhetoric nor does our approval of the title amount to an adjudication of a fact. Second, we find that the phrase "public protection" does not "rise to a comparable level of political and emotional language and subjective evaluation"[3] as did the use of the word "save" in Save Our Everglades. Third, the chief purpose of the proposed amendment is to provide a stricter law with regard to physician licensing than presently exists under the Florida Statutes. Thus, the proposed amendment is clearly a measure designed to protect the public, as are all other laws regarding professional licensing.
We next turn to the argument advanced by the opponents that the description of the current law contained in the ballot summary is misleading and omits material information. That description is found in the first line of the ballot summary, which reads: "Current law allows medical doctors who have committed repeated malpractice to be licensed to practice medicine in Florida." For support of their argument, the opponents cite Askew, 421 So.2d at 153, and Advisory Op. to Att'y Gen. re Casino Authorization, Taxation and Regulation, 656 So.2d 466 (Fla.1995). In response, the proponents argue that the description is an accurate statement of both the discretion currently granted to the Board of Medicine and the actual outcome of most cases under current law and that this ballot summary is distinguishable from those involved in the cases cited by the opponents.
In Askew, this Court struck a ballot summary that did not set out the chief purpose of the amendment. The summary stated that the amendment "[p]rohibits former legislators and statewide elected officers from representing other persons or entities for compensation before any state government body for a period of 2 years following vacation of office, unless they file full and public disclosure of their financial interests." 421 So.2d at 153. We found that the summary flew under false colors because it did not convey the true purpose and meaning of the amendment, which was to override statutory law providing for a complete two-year ban on lobbying. See id. at 155-56. Similarly, in Casino Authorization, Taxation and Regulation, this Court found a ballot summary was misleading for multiple reasons, including the following:
[W]e find that the first line of the summary is misleading in that it suggests that the amendment is necessary to prohibit casinos in this state. The summary *673 uses the following language: "This amendment prohibits casinos unless approved by the voters...." This language is misleading not because of what it says, but what it fails to say.... [T]he summary creates the false impression that casinos are now allowed in Florida. It fails to inform the voter that most types of casino gaming are currently prohibited by statute. See generally ch. 849, Fla. Stat. (1993). Without this admission, the summary suffers from the same defect as did the summary in Askew.

656 So.2d at 469.
We agree with the proponents that the instant case is distinguishable from Askew and Casino Authorization, Taxation and Regulation. In those cases, this Court found that the summaries flew under false colors because they suggested that the proposed amendments would result in new limitations or impose stricter limitations with regard to certain activities than had prior law, when in fact, the chief purposes of the proposed amendments were to create exceptions to preexisting limitations on those activities. Here, the descriptions of current law and the proposed amendment contained within the summary suggest that the proposed amendment will impose a stricter limitation with regard to physician licensing than provided under current law. That is not misleading because the chief purpose of the proposed amendment is to create a bright-line rule with regard to medical doctors who have committed repeated malpractice that is stricter than what is currently provided under section 458.331(1)(t).
The opponents to the proposed amendment further argue that the ballot summary contains terms that are ambiguous and omits certain information necessary for the voter to make an informed decision. First, they note that the summary fails to warn the voter that definitions of "medical malpractice" and "found to have committed" are contained in the proposed amendment. Second, they assert that the phrase "medical doctor" is ambiguous and should be defined because it could be construed to include only "physicians" licensed under Chapter 458 or the wider range of health care providers subject to malpractice under chapter 766. Third, they assert that the phrase "three or more incidents" is ambiguous and should be defined because it could be construed to mean three separate lawsuits, acts involving three different patients, or even three separate acts of negligence arising from treatment of the same patient.
It is worth repeating that section 101.161 requires that the ballot title and summary "state in clear and unambiguous language the chief purpose of the measure." Askew, 421 So.2d at 154-55. However, we find the opponents' arguments to be without merit because, as our prior case law states, "an exhaustive explanation of the interpretation and future possible effects of the amendment [is] not required" in the ballot title and summary. Advisory Op. to Att'y Gen. re: Amendment to Bar Gov't from Treating People Differently Based on Race in Pub. Educ., 778 So.2d 888, 899 (Fla.2000). We also specifically reject the opponents' arguments that the ballot summary is defective because of its use of the term "medical doctor" and the phrase "three or more incidents" because those words derive from the text of the proposed amendment itself.

V. CONCLUSION
For the foregoing reasons, we hold that the proposed amendment and ballot title and summary meet the legal requirements of article XI, section 3 of the Florida Constitution, and section 101.161(1), Florida Statutes (2003). This opinion encompasses *674 no other issues than those addressed herein and should not be construed as favoring or opposing the passage of the proposed amendment. Accordingly, we approve the placement of this proposed amendment on the ballot.
It is so ordered.
PARIENTE, C.J., and ANSTEAD, LEWIS, and QUINCE, JJ., concur.
PARIENTE, C.J., concurs with an opinion, in which ANSTEAD and LEWIS, JJ., concur.
BELL, J., dissents with an opinion, in which WELLS and CANTERO, JJ., concur.
PARIENTE, C.J., concurring.
I concur in the majority opinion, and write separately in response to Justice Bell's assertion that the summary misleads voters as to the current state of the law. In Armstrong v. Harris, 773 So.2d 7 (Fla.2000), this Court reiterated its statement in Askew v. Firestone, 421 So.2d 151, 156 (Fla.1982), that a ballot summary must convey the "true meaning, and ramifications, of an amendment." See 773 So.2d at 16. In Askew, the summary violated this requirement because it indicated that the amendment would restrict lobbying activities by former legislators and elected officials, whereas the amendment would actually have removed a two-year ban on lobbying already contained in the state constitution. See 421 So.2d at 155-56. In Armstrong, we struck a constitutional amendment in which the ballot summary failed to inform voters that the amendment would nullify an existing state constitutional prohibition of "cruel or unusual punishments," and instead implied that the amendment would promote the rights of Florida citizens through United States Supreme Court rulings construing the Eighth Amendment. See 773 So.2d at 17. See also Advisory Opinion to Attorney General re Protect People from the Health Hazards of Second-Hand Smoke, 814 So.2d 415, 419 (Fla.2002) (concluding that the summary adequately stated the amendment's chief purpose of banning smoking in enclosed indoor workplaces even though it did not state that smoking was already limited in certain public places). Thus, our focus in assessing whether a ballot summary conveys the true meaning and ramifications of the amendment has been whether the summary misleads voters into concluding that the amendment would provide greater citizen protection than current law, when in fact it would provide less protection than the Constitution or law currently provided.
As explained in the majority opinion, the ballot summary for this proposed amendment clearly conveys that the amendment will provide greater protection than under the current law from being treated by doctors who have repeatedly engaged in medical malpractice. The amendment will replace the current law, under which physicians with three malpractice "strikes" may be allowed to continue to practice medicine in this state, with a bright-line rule, under which suspension is mandatory. This change toward greater protection, the chief purpose of the amendment, is clearly conveyed in the summary.
ANSTEAD and LEWIS, JJ., concur.
BELL, J., dissenting.
The lead sentence of the ballot summary states that "[c]urrent law allows medical doctors who have committed repeated malpractice to be licensed to practice medicine in Florida." Although this sentence is technically correct, it fails to give "`fair notice' of the meaning and effect of the proposed amendment." In re Advisory Op. to Att'y Gen.Restricts Laws Related *675 to Discrimination, 632 So.2d 1018, 1021 (Fla.1994). A summary that gave voters fair notice would inform them that current Florida law gives a professional licensing board discretion to decide whether or not a medical doctor who repeatedly commits malpractice may continue to be licensed. The chief effect of the amendment would be to remove any such discretion. By reading the current ballot summary, a voter of reasonable intelligence could easily assume that there is currently no mechanism in place to revoke the license of a medical doctor who has repeatedly committed malpractice. This misleading language in the summary is exacerbated by the title of the amendment, "Public Protection from Repeated Medical Malpractice," which amplifies the implication that current law provides no protection for the public from medical doctors who commit repeated acts of malpractice.
In her concurrence, Chief Justice Pariente states:
The amendment will replace the current law, under which physicians with three malpractice "strikes" may be allowed to continue to practice medicine in this state, with a bright-line rule, under which suspension is mandatory. This change toward greater protection, the chief purpose of the amendment, is clearly conveyed in the summary.
Concurring op. at 674. Respectfully, I disagree. Chief Justice Pariente's statement provides much more context for the suggested change in current law than does the ballot summary. Nowhere does the ballot summary describe replacing the current law regarding suspension of medical doctors; it simply states that current law allows the licensing of medical doctors who have committed repeated malpractice. The replacement of the current law that gives discretion to a professional licensing board to suspend physician licenses with "a bright-line rule, under which suspension is mandatory" is, at best, only implied. Only those actually aware that a Board of Medicine exists and that current law vests it with discretion over the suspension of physicians' licenses would understand the unstated. The summary could have clearly stated this vital point with the thirty more words available but unused by the proponents. In my opinion, this failure is fatal.
In conclusion, the ballot summary fails to adequately explain the chief purpose of the amendment. Without a clearer statement of the current law, it does not fairly convey the true change in the law intended by the amendment. Fair notice of the "meaning and effect" of the amendment is not given. Therefore, I respectfully dissent.
WELLS and CANTERO, JJ., concur.
NOTES
[1] Under current Florida law, the Board of Medicine has the discretion to revoke or suspend a physician's license to practice medicine for "[g]ross or repeated malpractice or the failure to practice medicine with that level of care, skill, and treatment which is recognized by a reasonably prudent similar physician as being acceptable under similar conditions and circumstances." § 458.331(1)(t), Fla. Stat. (2003). Repeated malpractice is defined to include "three or more claims for medical malpractice within the previous 5-year period resulting in indemnities being paid in excess of $50,000 each to the claimant in a judgment or settlement and which incidents involved negligent conduct by the physician." Id.
[2] Fish & Wildlife Conservation Comm'n, 705 So.2d at 1353.
[3] Protect People from the Health Hazards of Second-Hand Smoke, 814 So.2d at 420.